UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

UNITED STATES OF AMERICA

VS.                                              CRIMINAL NO.: 3:08cr170-DPJ-FKB

CASSANDRA FAYE THOMAS

ORDER

This heathcare-fraud case is before the Court on Defendant Cassandra Faye Thomas's

Motion for Judgment of Acquittal or New Trial [76] and her separate Motion for New Trial

Based on Ineffective Assistance of Counsel [86].  The first motion raises no new issues, and the

second fails to establish the requirements for a Sixth Amendment challenge under *Strickland v.*

*Washington,* 466 U.S. 668 (1984).  The motions are therefore denied.

I.       Background

Dr. Cassandra Faye Thomas was charged in a ten-count indictment alleging that she

billed Medicare for healthcare services that were not reimbursable.  In general, Thomas sought

and obtained reimbursement for "physical medicine" services provided by unlicensed and

minimally trained "technicians" who treated the patients in the patients' homes without direct

supervision from a doctor.  The Government maintained that the services were insufficiently

complex to qualify for reimbursement, and alternatively, if they were so complex, then a doctor's

direct supervision—*i.e.*, presence in the same building—was required.  The jury convicted Dr.

Thomas on all ten counts, and she thereafter filed the two motions now before the Court.

The first motion was filed by Thomas's trial attorneys, Tom and Joyce Freeland.  But Dr.

Thomas later fired the Freelands and retained new representation to pursue an argument that her

attorneys were ineffective and thus deprived her of the Sixth Amendment right to counsel.  With

agreement of the Government, that issue was pursued pre-appeal, which caused significant delay.

Other delays in the briefing followed, and an evidentiary hearing was conducted on May 16,

2012, and concluded with argument on May 17. During that hearing, Defendant raised a new

issue regarding the failure to call expert witnesses in her defense, and additional briefing

followed. The matters are now ready for decision.

II.    Standard

Under Rule 29, the Court may set aside a jury's verdict of guilt if "the evidence is

insufficient to sustain a conviction" of one or more of the offenses charged in the indictment.

Fed. R. Crim. P. 29(a), (c). The standard for reviewing a claim of insufficient evidence is

"'whether, after viewing the evidence in the light most favorable to the prosecution, any rational

trier of fact could have found that the evidence establishes the essential elements of the crime

beyond a reasonable doubt.'" *United States v. Bellew,* 369 F.3d 450, 452 (5th Cir. 2004)

(quoting *Jackson v. Virginia,* 43 U.S. 307, 319 (1979)).

Rule 33 allows the Court to "vacate any judgment and grant a new trial if the interest of

justice so requires." Fed. R. Crim. P. 33(a). "The grant of a new trial is necessarily an extreme

measure, because it is not the role of the judge to sit as a thirteenth member of the jury." *United*

*States v. O'Keefe,* 128 F.3d 885, 898 (5th Cir. 1997). Therefore, "motions for new trial are not

favored, and are granted only with great caution." *Id.* (citing *United States v. Hamilton,* 559 F.2d

1370, 1373 (5th Cir. 1977)). "A new trial is granted 'only upon demonstration of adverse effects

on substantial rights of a defendant.'" *United States v. Rasco,* 123 F.3d 222, 228 (5th Cir. 1997)

(quoting *United States v. Cooks*, 52 F.3d 101, 103 (5th Cir. 1995)). An error affects the

defendant's substantial rights if "it affected the outcome of the trial court proceedings." *United*

*States v. Alarcon,* 261 F.3d 416, 423 (5th Cir. 2001); *see also United States v. Inman,* 411 F.3d 591, 595 (5th Cir. 2005) (holding that "[t]he restitution order affected [the defendant's] substantial rights because the outcome of the district court proceedings would have been different if the error had not occurred").

Unlike a motion for judgment of acquittal, the Court may weigh the evidence and assess the credibility of witnesses with respect to a motion for new trial. *United States v. Robertson,* 110 F.3d 1113, 1117 (5th Cir. 1997) (citing *Tibbs v. Florida,* 457 U.S. 31, 37–38 (1982)). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Id.* at 1118. "[A]ny error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Wall,* 389 F.3d 457, 474 (5th Cir. 2004) (quoting 3 Charles Alan Wright, et al., *Federal Practice and Procedure* § 556 (3d ed. 2004)). Based on the applicable standards, the Court finds that neither acquittal nor a new trial is warranted in this case.

III.    Analysis

A.    Motion for Judgment of Acquittal or New Trial [76]

1.    The Homebound Exception

The fundamental issue in this case is whether Thomas could bill the government for outpatient physical therapy performed by her employees *at a doctor's rate* and without the direct supervision of a doctor. 42 C.F.R. § 410.26(b) states that "Medicare Part B pays for services and supplies *incident to* the services of a physician." (Emphasis added). Subparagraph (5) then states that "[s]ervices and supplies must be furnished under the direct supervision of the

physician."  In *Glaser v. Wound Care Consultants, Inc.*, the Seventh Circuit concisely

summarized the program:

> [T]he general rule under these programs is that physician's assistants must bill
> Medicare and Medicaid at a lower rate for the work they do than if the same work
> had been performed by a doctor.  However, a health-care provider may use a
> doctor's identification number to bill Medicare and Medicaid for services
> performed by a physician's assistant—and thus obtain reimbursement at the
> doctor's rate—if the assistant rendered services "incident to" the services of a
> physician.

570 F.3d 907, 911 (7th Cir. 2009).  When a provider bills for such services, she certifies

compliance with applicable rules, regulations, and policies.  Thus, seeking reimbursement for

services that are not reimbursable is fraudulent.

Thomas argues, however, that the services provided by her technicians were covered

under Section 2051 of the Carriers Manual.[1]  That section states that Medicare will cover certain

services, including "[t]herapeutic exercises," provided to "homebound patients" in "medically

underserved areas" by auxiliary personnel under the general—rather than direct—supervision of

a physician.  To meet this exception, the services must, among other things, be "performed by

personnel meeting any pertinent State requirements" and the services must be "reasonable and

necessary."  The parties dispute whether Thomas met these criteria.

Starting with the state requirements, under Mississippi law, "physical therapy" is defined

as "the art and science of a health specialty concerned with the prevention of disability, and the

---

[1]The Carriers Manual was issued by the Health Care Financing Agency, now known as
the Centers for Medicare and Medicaid Services, the agency within the Department of Health and
Human Services that administers Medicare.  *Furlong v. Shalala*, 156 F.3d 384, 388 (2d Cir.
1998); *see* 42 C.F.R. § 400.200.  The Carriers Manual "contains policies, procedures and
instructions to govern carriers in their administration of the Medicare program, including rules
governing payment for various procedures."  *Furlong*, 156 F.3d at 388.

physical rehabilitation for congenital or acquired physical or mental disabilities, resulting from or secondary to injury or disease."  Miss. Code Ann. § 73-23-33(a).  The practice of physical therapy includes:

> treatment by therapeutic exercise, neurodevelopmental procedures, therapeutic massage, mechanical devices and therapeutic agents which employ the physical, chemical or other properties of air, water, heat, cold, electricity, sound, and radiant energy for the purpose of correcting or alleviating any physical condition or preventing the development of any physical or mental disability.

*Id.*  Mississippi law requires that "physical therapy services" be performed by a licensed physical therapist or physical therapist assistant, and a physical therapist assistant may perform physical therapy services only if she is working under the *direct supervision* of a licensed physical therapist.  *Id.* § 73-23-35(1); *see id.* § 73-23-33(c) ("'Physical therapist assistant' means a health care worker who assists a physical therapist in the provision of physical therapy under the direct, on-site supervision of the physical therapist.").  Section 73-23-35 of the Mississippi Code states that "[i]t shall be unlawful to employ an unlicensed physical therapist or physical therapist assistant to provide physical therapy services."[2]

At trial, and again in this motion, Thomas contended that the exercises her employees administered fall within a statutory exception to the licensing requirement for physical therapy. Section 73-23-37 of the Mississippi Code provides:

> Nothing in this chapter shall prohibit:
>
> . . . .
>
> (c) The performance by any person of simple mechanical or machine-assisted acts in the physical care of a patient, not requiring the knowledge and skill of a

---

[2]To the extent Thomas's technicians could be viewed as "physical therapist assistants," section 73-23-33(c) required on-sight supervision.

physical therapist under the order or direction of a licensed doctor of medicine or dentistry or of a physical therapist assistant under the direct, on-site supervision of a licensed physical therapist.

According to Thomas, this section permits technicians working "under the order or direction of a licensed doctor of medicine" to perform "simple mechanical or machine-assisted acts in the physical care of a patient" where those acts do not "requir[e] the knowledge and skill of a physical therapist." Def.'s Mot. [76] at 3.

Thomas's theory on section 73-23-37 was placed before the jury, and there was sufficient evidence to reject it even if the jury agreed with Thomas's interpretation of the statute. For instance, government witness John Fenstermaker analyzed Thomas's claims and explained that she used CPT codes that were primarily "physical therapy codes," including: "therapeutic activities," "therapeutic exercises," "massage therapy," and "neuromuscular education," and "ultrasound." These services, including "therapeutic exercise" are listed in the State's description of "physical therapy" for which a license is required. Miss. Code Ann. § 73-23-33(a).

In any event, Thomas's interpretation of section 73-23-37 is misplaced. She reads the statute as if the phrase "under the order or direction of a licensed doctor of medicine" is a stand alone clause that permits services as long as the technicians operate under a doctor's order or direction. This reading is inconsistent, however, with the "doctrine of the last antecedent," which provides that "relative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote." *Quindlen v. Prudential Ins. Co. of Am.*, 482 F.2d 876, 878 (5th Cir. 1973).

Applying that rule to this statute, and keeping in mind that physical therapy services must ordinarily be performed pursuant to the orders of a prescribing physician, the Court reads the

phrase "under the order or direction of a licensed doctor of medicine" as modifying the preceding phrase "not requiring the knowledge and skill of a physical therapist." Thus, the types of services section 73-23-37 covers would be those that do not require the "knowledge or skill of a physical therapist under a doctor's the orders or direction of a licensed doctor of medicine."[3] *Id.* The lack of a comma or other punctuation between "physical therapist" and "under the order" buttresses this construction.

As to whether the therapy provided by the technicians required the knowledge and skill of a physical therapist under a doctor's order or direction, Shirley Givens testified that "things that require the skill and education of a physical therapist" include "[d]eep tissue massage, ultrasound, balance and gait training, wheelchair transfer, functional capacity evaluations, any

---

[3]This is also consistent with the trial testimony of Shirley Givens, the licensing investigator for the Mississippi State Board of Physical Therapy:

Q Can you translate that for us and tell us what that really means?

A You could take in the case of—suppose your mother had a stroke, and she was being visited by a home health care, a physical therapy was part of her plan of care. Oftentimes a physical therapist will give the patient exercises to do between formal therapy sessions. If your mother needed assistance with some of these things, like if she was asked to walk a certain amount of feet a day or a certain amount of minutes, if you assisted her with her walking to make sure she didn't fall, or in her exercise sessions, if she needed weights or a balance ball or things like that, if you helped her with those things, that would be fine for you to do. As long as you did not then go out into the public and call yourself a physical therapist and start charging for your services or start billing for your services, it would be fine. You could do those things with that person without a license.

Q Would I have to have an order from a medical doctor to do that?

A No, you would not.

Trial Tr. Vol. 3 at 432–33.

number of things that require the skill and education of a physical therapist." Trial Tr. Vol. 3 at 434. Dr. Woodall testified that physical therapy training is necessary to perform gait training, therapeutic massage, range of motion exercises, and therapeutic ultrasound. *Id.* at 458–65. And, as noted, the bills in dispute use CPT codes describing the services in these same terms. Thus, a rational fact finder could find that section 73-23-37 is inapplicable.

Finally, the Government makes the alternative argument that if the therapies provided by the technicians were truly so simple that they did not require the knowledge and skill of a physical therapist under the orders of a doctor, then they were not eligible for the homebound exception. Section 2051 of the Carriers Manual, which is the sole source of Thomas's claim that the disputed reimbursements were proper, states that homebound services must be "required for the patient's care; that is, they are reasonable and necessary as defined in § 2303."[4] Another portion of the Carriers Manual addresses the circumstances under which physical therapy provided by a physician or physician employee is covered by Medicare as reasonable and necessary. Section 2218 of the Carriers Manual, about which Lynn Melear testified, states that such services

> must be of a level of complexity that require that they be performed by or under the direct supervision of the physician. Services which do not require the performance or supervision of the physician are not considered reasonable or

---

[4]Section 2303's definition of "reasonable and necessary" states as follows:

Items and services which are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member are not covered, e.g., payment cannot be made for the rental of a special hospital bed to be used by the patient in their home unless it was a reasonable and necessary part of the patient's treatment.

necessary physical therapy services even if they are performed or supervised by a physician.

*See* Trial Tr. Vol. 2 at 325–29 (Melear testimony regarding G-12). That document also states that

> [s]ervices that are palliative in nature are not considered necessary and reasonable and are not covered services. These services maintain function and generally do not involve complex physical therapy procedures nor do they require physician judgment and skill for safety and effectiveness.

Similarly, the Government relies on its trial exhibit G-13, which is a United HealthCare[5] Part B Medicare Local Medical Review Policy ("LMRP")[6] on physical medicine and rehabilitation that was produced in discovery by Dr. Thomas.[7] The LMRP states that, for

---

[5]United HealthCare was the predecessor to Cahaba GBA and processed Medicare Part B claims in and around 2000. Trial Tr. Vol. 2 at 318.

[6]An LMRP "embodies the majority view of local health care providers regarding the medical necessity of a certain good or service." *Arruejo v. Thompson*, No. CV-00-2402(JG)(SMG), 2001 WL 1563699, at *4 (E.D.N.Y. July 3, 2001). LMRPs "are promulgated when a carrier perceives a need to . . . articulate local policy in the absence of national policy, or respond to data indicating that certain medical services are being overutilized." *United States v. De Los Rios*, No. 10-20527-CR, 2011 WL 346087, at *4 (S.D. Fla. Feb. 1, 2011) (quoting *Arruejo*, 2001 WL 1563699, at *4). LMRPs "set regional coverage determinations that govern in the absence of or as an adjunct to a national policy." *United States v. Prabhu*, 442 F. Supp. 2d 1008, 1014 n.4 (D. Nev. 2006) (citing 68 Fed. Reg. 63,692, 63,693 (Nov. 7, 2003)).

[7]As Thomas points out, neither the LMRP nor the Carriers Manual have "the force of law." *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines . . . lack the force of law . . . ."). As an initial point, it is Thomas who relies on the Carriers Manual, which is the only source for the homebound exception she urges. Regardless, an LMRP *produced by her* speaks to her intent in terms of her knowledge of whether the carrier believed the services she was providing were covered by Medicare. *See De Los Rios*, 2011 WL 346087, at *5 ("[A]lthough the statutes under which Defendants are charged do not contain medical necessity as an element, evidence that the treatment provided was rarely appropriate or necessary would tend to prove that those claims were fraudulent and that Defendants intended to defraud Medicare. Evidence that Defendants billed Medicare with high frequency for medications that should rarely be given and in abnormal doses would assist the trier of fact to determine the issue of whether they possessed the requisite

physical medicine claims submitted by a physician, "[s]ervices performed . . . not under a physician's direct supervision[ ] are not covered," and that "[s]ervices that do not require the professional skills of a physician to perform or supervise them are not medically necessary."[8] Pressing this point at trial, the Government obtained the following testimony from Thomas:

> Q So I'm asking you as a physician in 2002 to 2004 in your mind, in your physician's mind, what you were sending these people out to do, the techs, was not complicated or complex enough to require a physician to do it, directly supervise it, or for a physical therapist to have to do it or directly supervise it. Is that right?
>
> A That's right.
>
> Q And as a medical doctor, that's still your opinion about what happened, notwithstanding whether Medicare says they will pay for that or not.
>
> A As a medical doctor, that's what happened, yes.

Trial Tr. Vol. 5 at 996–97.

---

*mens rea*.")

[8]The LMRP further states:

> It is not medically necessary for a provider to perform or supervise maintenance programs that do not require the professional skills of a provider. These situations include:
>
> a. Services related to activities for the general good and welfare of patients (i.e. general exercise to promote overall fitness and flexibility); [and]
>
> b. Repetitive exercises to maintain gait or maintain strength and endurance, and assisted walking such as that in support for feeble or unstable patients . . . .

In sum, the jury had sufficient evidence to find that if the procedures were simple enough to qualify under section 73-23-37, then they would not qualify as "reasonable and necessary" under Section 2051 of the Carriers Manual where the homebound exception was created. Alternatively, the jury could have found that the procedures were of the complexity that the CPT codes and other evidence suggested, and were not therefore simple mechanical services falling below the "knowledge or skill of a physical therapist under the orders or direction of a licensed doctor of medicine." Miss. Code Ann. § 73-23-37. In either event, the evidence supported the verdict.

### 2. Exclusion of Exhibits D-4 and D-5

Thomas claims the Court erred in excluding Exhibits D-4 and D-5. D-4 was an excerpt from the Federal Register concerning rule changes or clarifications that occurred in 2005—after Thomas closed her clinic. D-5 is an article from the OIG regarding those same changes. Under the new regulations, individuals providing "incident to" services *under direct supervision* were required to possess certain professional qualifications. According to Thomas, exclusion of the documents "inappropriately limited the Defendant's ability to present circumstantial evidence that supported her 'good faith' defense to all counts." *Id.* at 5. Although Thomas waived the argument as to D-5 by failing to offer it at trial, even if she had offered both exhibits they were inadmissible.

To begin, Thomas never read these documents, which were published after the alleged crime. She could not, therefore, suggest that they misled her in some way. Moreover, they offer little insight into her knowledge as it relates to the good faith defense. That ruling leaves two

more significant issues—(1) whether the exhibits reflect any relevant confusion; and (2) whether evidence that someone else was confused is probative of Thomas's good faith.

First and foremost, D-4 and D-5 address an irrelevant issue. As explained in two more detailed trial rulings, these exhibits address the necessary qualifications for individuals providing "incident to" services *under a doctor's direct supervision*. That is not the issue here. The issue instead is whether Thomas could seek "incident to" reimbursement for technicians providing services in peoples's homes without direct supervision. And there is no indication of confusion on that point—direct supervision was required. In fact, D-4 and D-5, and commentators quoted therein, acknowledge that services will be under direct supervision. They merely question the level of qualifications necessary for those providing services under direct supervision. Thus, the Court would not allow Thomas to introduce a document that showed uncertainty regarding a very different billing issue and then confuse the jury into attributing that uncertainty to the actual billing practices at issue in this case. Simply stated, the confusion about licensing requirements for those under direct supervision has no bearing on alleged confusion regarding the need for direct supervision. D-4 and D-5 were irrelevant and their admission would be substantially more prejudicial and confusing than probative. *See* Fed. R. Evid. 401–403.

At the post-trial hearing, Thomas's new counsel suggested that the Court correctly interpreted the interplay among the various regulations, but argued that the depth of the analysis demonstrates the confusing nature of the issues. Thomas's original attorneys made essentially the same argument, and for that reason the Court allowed Thomas to develop this defense in several ways. First, she had every opportunity to say that she was confused about the regulations applicable to her billing practices. Second, Thomas was allowed to introduce evidence that the

regulations changed in 2005—even though it was about a different issue. Third, counsel was allowed to argue confusion during summation, which he did in conjunction with the good faith instruction given over the Government's objection. This approach tracked the one taken in tax cases like *United States v. Simkanin*, where defendants are allowed to discuss certain regulations without admitting them into evidence. 420 F.3d 397, 404 (5th Cir. 2005). And if error occurred, which is not apparent, it was harmless.[9]

Finally, the parties dispute whether Thomas should have been allowed to offer evidence that other people were confused, even if she never read the materials herself. It is hard to view this argument apart from the fact that the alleged confusion addressed an irrelevant issue. Regardless, any error would be harmless. *See United States v. Herzog*, 632 F.2d 469, 473 (5th Cir. 1980); *see also United States v. Burton*, 737 F.2d 439, 443–44 (5th Cir. 1984); *United States v. Daly*, 756 F.2d 1076, 1083 (5th Cir. 1985).[10]

3.      Rule of Lenity

Thomas renews her argument that the regulations, Carriers Manual, and other materials were confusing and therefore the rule of lenity applies. The Court provided a detailed ruling on

---

[9]Thomas heard the Court mention tax evasion cases during a status conference. She now claims that the Freelands were ineffective for rejecting her instruction to file a motion based on those cases. It remains unclear what sort of motion Thomas envisioned, but *Simkanin* supports the approach that was taken. The Court's statements did not suggest or invite a motion, and the Freelands were not ineffective for failing to file one.

[10]A similar issue arose in *United States v. Jones*, a case in which Dr. Thomas was acquitted of similar charges. 664 F.3d 966, 975 (5th Cir. 2011). There, the Fifth Circuit affirmed exclusion of GAO documents Thomas's co-defendants offered to show that the information that was given Medicare providers was often "incomplete, confusing, out-of-date, and/or incorrect." The court affirmed noting that although the reports may have shown some confusion in the industry, they lacked probative value because they did not reference the third-party administrator at issue.

this issue on February 14, 2011, and Thomas has presented no new arguments for changing that ruling. That said, there was no ambiguity with respect to the criminal statutes charged in the indictment, and it is not clear that the rule of lenity would apply to materials such as the non-criminal federal regulations and the Carriers Manual. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995).[11]

### 4. Count Six

Thomas contends that Count Six, premised on 18 U.S.C. § 641, should be dismissed because healthcare fraud is not "theft." The Court incorporates its pre-trial ruling on this point, but also notes that since that ruling, the Fifth Circuit affirmed § 641 convictions for heathcare fraud in *Jones*. 664 F.3d at 976–78.

### 5. Admission of G-13

Thomas contends that the court erred in admitting G-13, a local medical-review policy published in the *Medicare News*, which purported to establish billing requirements for physical medicine services. Although she raised this issue in a pretrial Motion in Limine, Thomas failed

---

[11]Thomas's new counsel makes a similar argument under *Jones*. There, the Fifth Circuit held, "[T]o show that the Appellants knowingly converted the funds, the Government must show that the Appellants knew that their claims were false by proving the Appellants' interpretation of the law was not reasonable." 664 F.3d at 977. The Court then stated, "Though there was *some* ambiguity in the Medicare regulations involving the use of unlicensed KTs to provide treatment without the direct supervision of a physician," the Government's proof on other billing irregularities was sufficient to support the verdict. *Id.* (emphasis added). The issue was intent, and assuming the statement regarding "some ambiguity" is not dicta, the Fifth Circuit did not offer a vagueness analysis. Instead, it viewed the billing practices in light of the record evidence and determined that sufficient evidence supported a finding of intent on at least a portion of the Government's theory. This case involves a different evidentiary basis. Here, the evidence supports a finding that Thomas knew direct supervision was necessary. *See infra* Part III(A)(7). Moreover, there was testimony that she was specifically told that her billing practices were not legal.

to renew and therefore waived objection at trial absent clear error. Admission was not clear error for three reasons. First, cases such as *United States v. Brown* state that such materials are relevant to intent. 553 F.3d 768, 790–91 (5th Cir. 2008). Second, the document was in her possession. Third, the Court gave a limiting instruction that stated: "To be clear, defendant is not being charged with violating something that might be written in these materials. She is charged with violating the specific criminal statutes listed in the indictment and about which I will instruct you." Admission of G-13 was not improper and was otherwise harmless.

6.    State Licensing Requirements

Thomas renews her pretrial Motion in Limine [34] addressing the admission of evidence about state licensing requirements for those providing in-home services. In particular, she objects to admission of statutes and regulations related to the State of Mississippi's Physical Therapy Board (exhibits G-16, G-17, and G-18) and to testimony by Shirley Givens explaining them. Because Thomas did not renew her objections to Givens or these exhibits at trial, she waived the arguments absent clear error.

Clear error did not occur for two reasons. First, Thomas made the state requirements relevant when she relied on the Carriers Manual to argue that direct supervision was not required for homebound patients in underserviced areas. That exception applied only when the technicians met "any pertinent State requirements." Carriers Manual § 2051. Second, in *Jones*, the Government offered evidence regarding the interplay of the Medicare regulations, state requirements under those regulations, and the federal crimes, and the defendants appealed because the trial judge did not give a limiting instruction. Instead, the court gave the standard final instruction that "The defendants are not on trial for any act, conduct, or offense not alleged

in the indictment." The Fifth Circuit still affirmed. 664 F.3d at 981. In the present case, the Court gave a limiting instruction, *sua sponte*, when the evidence came in, reminding the jury that Thomas was not on trial for violating the state statutes. All parties agreed with the wording of that instruction. Clear error has not been established.

7.    Sufficiency of the Evidence

Thomas finally argues the verdict was against the weight of the evidence. As an initial matter, it merits repeating that Thomas was convicted of making false statements and stealing government money, not with violating some regulation or procedure. More precisely the jury found that she falsely stated to the government that she followed all program instructions such that the reimbursements were appropriate. The following evidence supports that finding:

- Frank Wiley—Thomas's former employer—testified that he told Thomas before she opened her clinic that direct supervision was legally necessary to seek "incident to" reimbursement for these services.

- Thomas conceded that when her billing agent Charlett Comfort warned of other problems with the billing units, Thomas resisted correction and told Comfort she did not want to raise a red flag with Medicare.

- Thomas's husband and office manager told Comfort it was none of her business.

- Thomas testified that when she realized she was under investigation she decided to document her files and personally created job descriptions for the employees. She included tasks she knew the employees never performed, to include the false statement that they worked under direct personal supervision. She then had some former employees sign the after-the-fact documents long after their employment ended, and in some cases the signatures were forged. She candidly admitted that she did this because she was being investigated, and this conduct is typical consciousness-of-guilt evidence that is probative of a defendant's intent.

- The entire operation lacked the air of legitimacy in ways that are probative of intent. A jury could have reasonably concluded that Thomas (1) hired

employees with no healthcare experience; (2) provided minimal training by less than qualified individuals; (3) inflated the training certificates; (4) billed grossly and obviously inflated hours; (5) required job applicants to recruit new patients before they could be hired; (6) expressly targeted Medicare/Medicaid eligible patients; and (7) made no effort to collect deductibles.[12]

Although Thomas testified that she tried to follow the rules, she was also asked to admit that she was not "excited about" finding out what was right and wrong. She responded that if it was wrong, then Cahaba would have told her. That response, in conjunction with the testimony that she did not want to raise any red flags, easily suggests a level of concern and a conscious decision not to address the problem. It likewise fits within the deliberate ignorance instruction given at the close of the case.

Finally, the Government made much of the fact that Thomas collected incredible sums of money through the clinic by billing essentially unskilled employees at physician rates. The amounts received from that operation far exceeded the sums she earned in her legitimate medical practice. Thomas herself testified that the sums were "stunning." A rational juror could find knowledge and intent from the incongruity of making millions billing unlicensed and minimally trained employees at a doctor's billing rate while earning substantially less through legitimate medical practice.

B.     The Ineffective Assistance of Counsel Motion [86]

Thomas alleges that her trial attorneys, Tom and Joyce Freeland, failed to provide effective counsel thereby depriving her of the Sixth Amendment right to counsel. The parties agree that *Strickland v. Washington* provides the framework for Thomas's Sixth Amendment

---

[12]This list is not intended to be exhaustive.

ineffective assistance of counsel claim. 466 U.S. 668 (1984). To meet this test, Thomas must demonstrate that counsel's performance was deficient and prejudicial. *Id.* at 687.

To prove the deficiency prong of the test Thomas "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. In considering an attorney's performance under this element, the court considers the "reasonableness [of the attorney's performance] under prevailing professional norms." *Id.* The *Strickland* court cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. Thus, there exists a "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* at 689; *see also Halley v. Thaler*, 448 F. App'x 518, 523 (5th Cir. 2011). As stated in *Strickland*:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689. As to trial strategy, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The prejudice prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. To meet this standard, Thomas "must show that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Where, as here, "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. . . . Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695–96. With those standards in mind, the Court turns to the specific arguments.

### 1. Evidence that Bank Accounts Were Seized

Thomas claims that the Freelands should have objected to testimony that the Government seized funds from various bank accounts, contending that the evidence was inadmissible under Rules 401, 402, and 403. She argues generally that the evidence was irrelevant and more specifically that allowing a white jury to hear that an African-American doctor had accumulated a large sum of money was unduly prejudicial. This argument fails both prongs of the *Strickland* standard.

Starting with the performance prong, Tom Freeland testified that he hoped to demonstrate Thomas's good faith by showing that she held most of the reimbursements in bank accounts so she could return the funds if she learned that mistakes had been made. Intent was a key issue, and trial strategy is "virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. Thomas

contends, however, that while some of the funds were directly wired into one of the accounts, there is no evidence that all three accounts held funds from the reimbursements. This is a distinction without a difference with respect to the stated trial strategy. Finally, the evidence was relevant and would have been admitted. Although Thomas argued that it showed good faith to hold the money, the Government contended that the large sums she earned so quickly demonstrated her knowledge of a problem. Either argument was reasonable, and it was for the jury to decide.

Turning to prejudice, the Court finds none. First, the Court is not willing to find that a predominantly white jury would be prejudiced by evidence that an African-American doctor held millions of dollars in various accounts, especially when three African-Americans joined in the unanimous verdict. Second, even if such prejudice could be inferred, the jury heard the actual amounts billed and reimbursed, so it already knew that Thomas received millions of dollars for these activities—a fact that was relevant to her knowledge and intent. There is little added prejudice from the fact that Thomas put the money in bank accounts—a prudent move. Third, the jury was expressly instructed that its verdict must be based solely on the evidence and could not be the result of prejudice. Jurors are presumed to follow their instructions.

Finally, Thomas suggests prejudice from evidence showing the money was seized. This is a "trivial" matter that would not have a "pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland*, 466 U.S. at 695–96.

2.      Thomas's Right to Participate

Rule 43 of the Federal Rules of Criminal Procedure allows a criminal defendant to participate in every trial stage, including jury impanelment.  That right is also reflected in her due process right to a fair and just hearing.

The first issue is whether Thomas waived this right.  Rule 43(c)(1) of the Federal Rules of Criminal Procedure addresses the point and states that a defendant who was initially present at trial waives this right "when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial." Fed. R. Crim. P. 43(c)(1)(A).  During trial, the Court asked Tom Freeland at least twice whether his client had been informed of her right to be present, and he stated that she had and waived it. But Freeland's post-trial affidavit never contradicts Thomas's claim to the contrary.  And although he later denied Thomas's claim at the post-trial evidentiary hearing, the testimony was not compelling in content or demeanor.  The Court therefore finds that Thomas did not waive the right to be present.

So the question is whether her absence establishes ineffectiveness.  As stated in *United States v. Gagnon*:

> a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge. . . .  [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only."

470 U.S. 522, 526 (1985) (holding that that defendants' due process rights were not violated by their absence at an *in camera* discussion with a juror because the defendants "could have done nothing had they been at the conference, nor would they have gained anything by attending").

Said differently in *Snyder v. Massachusetts*, a defendant does not have the right to be present "when presence would be useless or the benefit but a shadow." 291 U.S. 97, 106–07 (1934), *overruled in part on other grounds, Malloy v. Hogan*, 378 U.S. 1 (1964).

Having said all that, this issue is before the Court under the Sixth Amendment, which requires a showing of ineffective performance and prejudice. Thomas attempts to meet that standard with reference to four specific circumstances during the proceedings: (1) failing to object to the dismissal for cause of Juror 19, an African-American male who was sleeping during jury selection; (2) failing to move to strike Juror 17 for cause because he previously cooperated with the Office of the Inspector General; (3) responding to a jury question; and (4) failing to raise a *Batson* challenge. The Court will address each argument.

a.      Juror 19

There is no dispute that Juror 19 was napping during jury selection, prompting a motion to strike by the Government. Freeland did not dispute the motion, and Thomas now contends that he was ineffective because she wanted to keep the juror due to his race and sex. Thomas first suggested that had she been present, there were things Freeland could have done to make Juror 19 more alert during voir dire. But Thomas was present during voir dire and sitting next to Freeland when she saw Juror 19 dozing. Yet she apparently did nothing to encourage Freeland to take action.[13] This argument fails to meet either *Strickland* prong.

Thomas's more significant argument is that had she been in the room when the jury was selected, she would have fought to keep Juror 19 and that her attorneys violated her instruction to

---

[13]This testimony also undermines her position that her presence at other times would have made a difference.

keep the juror because he was a black male. The *Batson* implications are obvious, and Thomas has offered no argument that an attorney is ineffective for failing to follow instructions that violate the United States Constitution. Moreover, she has not demonstrated how having Juror 19 serve—even assuming the Government would not have used a peremptory strike—satisfies the *Strickland* prejudice prong. *See Mays v. Cockrell*, 31 F. App'x 832 (5th Cir. 2002) (rejecting ineffectiveness claim noting that defendant failed to explain how release of a juror was improper or how it prejudiced the outcome of the trial).

### b.    Juror 17

Juror 17 served on the jury. During voir dire, he stated that while working as a postmaster he caught an employee stealing mail, and dealt with the OIG at that time "getting him." The Court specifically asked whether that experience would in any way prevent the juror from being fair, and he said no. The Court accepted the juror's statements. Thomas now contends that her attorney was ineffective for failing to strike Juror 17 and not exercising a peremptory challenge.

Starting with the strike for cause, the Fifth Circuit has held in cases such as *Virgil v. Dretke* that if a juror is not biased, counsel's failure to challenge that juror does not support a claim for ineffective assistance of counsel. 446 F.3d 598, 608–09 (5th Cir. 2006). There is nothing in the record suggesting that Juror 17 was biased in any way whatsoever. The Court credited his statement that he was not biased, and because there is no evidence of express bias here, Thomas must show specific facts demonstrating such a close connection between the juror and the circumstances at hand that bias is implied as a matter of law. *See United States v. Scott*, 854 F.2d 697, 699 (5th Cir. 1988). As observed in cases such as *Andrews v. Collins*, juror bias is

imputed only in extraordinary circumstances. 21 F.3d 612 (5th Cir. 1994). Here, Juror 17's experience at the post office was not remotely similar to the case at hand and in no way suggests that Juror 17 harbored disqualifying bias.

At the post-trial hearing, Thomas argued that Freeland should have used a peremptory strike on this juror and that, had she been present, she would have made sure that happened. But she also testified that the only specific instruction she gave the Freelands before the jury was selected was that she wanted a black male on the jury. She denied giving any other specific advice even though the Court gave the Freelands and Thomas ample time before selection began. If Thomas truly said nothing when given that opportunity, then there is no reason to believe she would have contributed during the selection.

Tom Freeland, on the other hand, stated that he did meet with Thomas before the selection process, that she provided specific information at that time, and that he used that information—including Thomas's desire to strike other jurors—when deciding not to strike Jury 17. Ineffectiveness in this regard is not apparent, but in any event, Thomas has not demonstrated prejudice.

c.      Jury Question

In her initial memorandum, Defendant claimed that her absence from a conference involving a jury question created grounds for ineffective assistance. But as the Government observed, Thomas misstated the jury's question in her motion. At the post-trial hearing, Thomas's counsel conceded that the Court's response to the question was not error. This was a purely legal question that was correctly answered. No prejudice is shown.

d.    Failure to Raise a *Batson* Challenge

Thomas's initial memorandum included a single sentence that stated: "In [a]ddition, the Freelands failed to raise a *Batson* challenge when it was clear that the prosecution was attempting to strike black jurors." Def.'s Mem. [87] at 9. The issue received slightly more attention at the hearing, with counsel arguing that a *Batson* challenge could have been made. It is not clear how Thomas's presence would affect this issue, but the Court will nevertheless address the argument on its face.

The Court's records indicate that of the available jurors, the Government struck 1 white juror and 5 African-American jurors, and accepted 3 African-Americans to serve on the jury. Defendant used 9 of her 10 strikes on white jurors, which drew an initial objection that the Government withdrew. Thus, based solely on the numbers, Thomas's position at the *prima facie* stage was about the same as the Government's, and it was the Court's impression that neither side wished to engage in cross-*Batson* challenges. Thus, the Court could readily understand Thomas's counsel not wishing to raise the issue. Plus, even if she could make a *prima facie* showing under *Batson*, Thomas's current motion fails to demonstrate why the Government's peremptory strikes were pretextual. Finally, had cross-motions been pursued, it is impossible to say that the racial makeup of the jury would have been any different. Thus, the argument fails both prongs of the test.

3.    Trial Preparation Issues

Thomas asserts that the Freelands' pre-trial investigation and preparation were insufficient and resulted in their failure to offer exhibits, witnesses, and defenses. As noted in *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable

decision that makes particular investigations unnecessary." 466 U.S. at 691. The scope of the investigation required varies from case to case, but "at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." *Nealy v. Cabana*, 764 F.2d 1173, 1177 (5th Cir. 1985). "A defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989). A failure to investigate the law that deprives the defendant "of the opportunity to assert a viable defense to the charges against him" may support a finding of ineffective assistance. *United States v. Juazrez*, No. 09-20764, 2012 WL 592861, at *7 (5th Cir. Feb. 29, 2012).

Before addressing the specific deficiencies Thomas alleges, the Court finds as a factual matter that the preparation was not constitutionally deficient. First, this was not the Freelands' first time to defend Thomas on these issues. As noted earlier, Thomas was a defendant in *United States v. Jones*. Thomas attempts to distinguish that case, but there was overlap, and having successfully defended her in that multi-week trial, the Freelands probably had a better understanding of the case than one would normally expect, as reflected in their substantial pre-trial motions.

At the post-trial hearing, Thomas argued that the Freelands merely piggy-backed on their work in *Jones* without properly preparing for the new trial. But that argument is not supported by the evidence. The present case was set and then rescheduled several times, and there was sufficient evidence that the Freelands prepared each time. As for the final preparation in the weeks leading to trial, one of the Freelands' former associate attorneys testified credibly that the

entire office, including three attorneys, law clerks, an investigator, and runners were completely dedicated to this case. *Strickland* does not require perfect preparation, and the level of preparation demonstrated in the record was sufficient. Having addressed that, the Court examines Thomas's more specific contentions regarding lack of preparation.

a.      The Homebound Exception

Thomas first argued that the Freelands failed to "uncover a Medicare Benefits Policy Manual which states that it is appropriate in medically underserved areas for medical personnel to provide homebound service to patients through the use of nurses and technical personnel under general rather than direct supervision." Def.'s Mem. [87] at 10–11. Tom Freeland testified at the post-trial hearing that he was well aware of this exhibit, and the Court credits the testimony based on his pre-trial motions referencing the defense.

Regardless, the language from the Medicare Benefits Policy Manual that Thomas claims Freeland failed to discover is reflected, verbatim, in the Carriers Manual. Thomas initially argued that Freeland failed to discover this document as well, but it was introduced into evidence, the Freelands repeatedly referenced this very language during trial, they obtained a stipulation that Flora, Mississippi, qualified as an underserviced area in support of this argument, and they argued the point in closing. In sum, the Freelands certainly discovered these documents and repeatedly pressed this very argument.

In light of all that, Thomas took a different approach at the hearing, arguing that the Freelands did not effectively present the theory because they failed to introduce the Medicare Benefits Policy Manual and another document into evidence to show that the homebound exception was reflected in more than one place. The problem with that argument is that the

27

Government never disputed the existence of the exception.  In fact, its own witnesses discussed it at length and the Government entered a stipulation regarding the underserviced requirement of the exception.  Thomas cannot, therefore, show ineffective assistance of counsel based on the fact that the Freelands failed to offer multiple documents providing the same non-disputed language.  And in any event, no prejudice is shown.

        b.      Confusion

Thomas argues in rebuttal that counsel "failed to introduce sufficient evidence that there was confusion in medical communities across the country about billing for physical therapy and related services."  Thomas is first critical of counsel's failure to convince the Court to admit D-4.  As an initial point, one simply cannot say the Freelands failed to adequately prepare and therefore missed this argument or this document—they hammered the point before, during, and after trial.  And as the Court stated on the record at the evidentiary hearing, Thomas's new counsel misinterpreted the trial record with respect to the level of the Freelands' preparation regarding this document.  The document simply was not admissible for the reasons stated above.  Thus, the argument fails both prongs of the test because the performance was not deficient and there is no prejudice.

Another document Thomas claims the Freelands could have presented to show confusion had they adequately prepared was D-5, a January 2009 United States Attorneys' Bulletin entitled *"Incident to" Nothing: A Comprehensive Analysis of Physician Billed Physical Therapy Services and Enforcement Action Targeting Fraudulent Physical Therapy Practices*.  Like the Freelands, Thomas's current attorneys offer the same generic argument for admission, contending that the document demonstrates "the confusion in the medical community prior to 2005 regarding billing

practices of physicians." *Id.* As stated earlier, the confusion about licensing requirements for those under direct supervision has no bearing on alleged confusion regarding the need for direct supervision. D-4 and D-5 were irrelevant and their admission would be substantially more prejudicial and confusing than probative. *See* Fed. R. Evid. 401–403. For this same reason, the Court rejects the contention that the Freelands were ineffective for failing to offer other materials concerning these same revisions. Def.'s Rebuttal [100] at 20.

Finally, although the Court concluded that the 2005 changes addressed an issue different from what Thomas was accused of doing, something even current counsel seems to accept, the Court nevertheless allowed the Freelands to offer evidence that changes were made. In other words, they were allowed to tell the jury about changes, but were not allowed to offer documents showing that people were confused about an irrelevant rule change. Mr. Freeland was then able to solicit this evidence through witnesses and argued it during closing. Thus, the evidence and arguments reached the jury and there was no deficiency or prejudice.

c.      Thomas's Preparation to Testify

Thomas argues that she was inadequately prepared to testify because she had only a couple of brief "mock" trials and then spent only about two hours preparing the day before her testimony. There is no indication, however, that this level of preparation was inadequate.

Turning to the prejudice side of the equation, Thomas contends that had she spent more time with Tom Freeland he would have known what to ask and she would have been able to tell the jury the things she wanted to convey. The Court asked Thomas what she would have said if given the opportunity, and she generally identified testimony that she either gave at trial or could have provided based on the non-leading questions that were asked.

For example, Thomas first expressed disappointment in having been denied the opportunity to tell the jury her intentions were good and that she tried to follow the rules but was confused. In fact, she told the jury she did not know what "direct supervision" meant until after she was being investigated, that she made efforts to find out what she may have been doing wrong, that she could not get an answer from Medicare, and that as soon as she learned direct supervision was required she shut the clinic doors. There was no prejudice.

Along these same lines, Thomas testified at the hearing that she was denied the opportunity to tell the jury that her former employee, Mary Brown, made efforts to clear up any confusion by calling Medicare. But again Thomas gave that very testimony at trial more than once and informed the jury "Mary Brown called them I don't know how many times." She added that they never got any answers.[14]

Thomas also claimed that she should have been allowed to discuss the confusion in the industry regarding changes in the regulations. As an initial matter, there is no indication she actually knew there was confusion, so she would lack personal knowledge to give that testimony. But even if she was aware of confusion, the testimony would not have been admitted because again the confusion related to a different issue. Finally, it should be noted that counsel was not permitted to ask leading questions. And many of the open-ended questions Freeland asked could have easily invited Thomas to repeat these themes she claims she would have mentioned if given the chance. For all these reasons, the argument fails both prongs.

---

[14]This testimony in the post-trial hearing damaged Thomas's credibility as the Court gave Thomas several opportunities to recall her testimony regarding Brown.

d.    Use of an Investigator to Research Jury

Thomas cites the Freelands' failure to use an investigator to assist in jury selection.  But this argument satisfies neither prong of the *Strickland* standard.  Such consultants are neither constitutionally mandated nor generally employed in this venue.  Unlike other venues, jury information is provided minutes before jury selection.  Thus, even if hired, the investigator would have been of little value.  Finally, there is no indication that any of the jurors were tainted or that having an investigator would have changed the result.

e.    Preparation and Presentation of Trial Witnesses

Thomas makes several arguments regarding counsel's efforts to prepare and examine various trial witnesses.  None of the arguments meet the *Strickland* prongs.

i.    Heather Sheppard

Heather Sheppard was a Cahaba employee who was involved in the programs at issue.  She testified in *United States v. Jones*, and according to Dr. Thomas and Tom Freeland, Sheppard's testimony in that trial seemed confused.  Although Freeland called Sheppard during this trial, Thomas criticizes Freeland for failing to designate her as an expert and for failing to better replicate the testimony in *Jones*.

Starting with the suggestion that Freeland should have designated Sheppard as an expert, this is a matter of strategy that the Court will not disturb.  That said, Sheppard firmly and repeatedly testified that Thomas's billing practices were improper.  In fact, Sheppard was asked point blank in *Jones* to agree that there was confusion.  She testified repeatedly, "I disagree."  It is not clear why Thomas would want to elevate those statements to expert opinion.

As for Freeland's inability to again confuse Sheppard, Freeland testified during the hearing that the confusion could not be replicated. Mr. Freeland's point was not apparent to the Court during the evidentiary hearing, but review of Sheppard's trial testimony in *Jones* sheds light. Having reviewed the excerpts from that trial that Thomas provided, it is clear that Sheppard's alleged confusion was not related to the application of the regulations and materials. For example, Thomas points to Sheppard's testimony that she could not find the homebound exclusion in the regulations. The reason is simple: the federal regulations do not provide for that exception which is found instead in the Carriers Manual—a point Sheppard emphasized during her *Jones* testimony.

Perhaps the only real confusion that occurred in *Jones* related to an esoteric discussion of whether the homebound service exception in the Carriers Manual was an "exception" or simply part of the definition of "general supervision" which is itself an exception to "direct supervision." That line of cross-examination questions lasts a while and may have conveyed confusion, but it was hardly over a material issue. Whether it is an exception or just part of a rule that is an exception, the fact remains undisputed that the homebound provision exists. The question is whether Thomas complied with it, and Sheppard firmly maintained that Thomas did not.

ii.     Betty Russell and Marie Jones

Russell and Jones were CMPM patients who testified at the trial in Thomas's defense. They both claim that preparation was inadequate, but the information they possessed does not relate to the core billing issues that were in dispute. They have not not shown that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceedings would have been different.

### iii.     Charlotte Priest and Claude Barry

Priest and Barry worked at CMPM, and both spoke with counsel on more than one occasion before their testimony.  Barry questions why he was asked about a flyer advertising the clinic since he did not know about the flyer.  The flyer advertised the clinic's services and was offered by the Government to show an intent to maximize reimbursements.  Barry's testimony was helpful in showing that people in the clinic (*i.e.*, Thomas) did not know about the flyer.  The performance was not inadequate with respect to these witnesses, and looking at their proffered testimony, the Court cannot say that it shows a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceedings would have been different.

### iv.     Ritha Bookert and Parthena Gross

In her rebuttal, Thomas makes the additional argument that the Freelands "failed to properly prepare witnesses for cross-examination."  Def.'s Rebuttal [100] at 12.  Thomas points to the fact that Tom Freeland had not interviewed prosecution witness Parthena Gross, a former secretary for CMPM, before cross-examining her, and that his cross-examination of prosecution witness Ritha Bookert, a former CMPM nurse practitioner, elicited testimony that was "only minimally relevant to Dr. Thomas'[s] defense of the charges asserted against her."  *Id.* at 13.  Regardless, she has not shown that the examinations were constitutionally infirm or prejudicial.

### v.     Kae Patterson

Kae Patterson performed bookkeeping work for Dr. Thomas and was interviewed by Mr. Freeland.  Clear strategic reasons support the decision not to call Patterson.  First, the potentially favorable testimony she offered was not overly helpful.  Second, she possessed certain information that would damage the case, primarily that Thomas pocketed large sums of money

from the clinic, which contradicted Thomas's theory. Third, Ms. Freeland said that Patterson was chatty and difficult to focus. Finally, it appears that she was a reluctant witness who ultimately said she did not wish to testify.

vi.    Mary Brown

Brown claims that she was not interviewed prior to trial, but Freeland says she was and has the notes to prove it. Regardless, Thomas has not explained how the allegedly deficient performance of counsel affected the results of the proceedings.

vii.    Thresa Smith

According to Thomas, the Freelands failed to interview Thresa Smith, who was a nurse practitioner for Thomas and testified before the grand jury. There was no ineffectiveness in failing to call this witness. First, the Freelands did not fail to investigate in as much as they read the grand jury testimony which obviously limited what the witness could say at trial. Second, Thomas's paraphrasing of the grand jury testimony is generous and not supported by what the witness actually said. Third, the testimony was actually damaging. For example, Smith refused to sign a post-investigation job description because it was inaccurate. Those job descriptions provided damaging proof of Thomas's knowledge and intent. Thus, even if Smith was ready and willing to testify, the decision easily falls within the strategy category.

viii.    Clara Reed

Thomas claims that the Freelands failed to interview Clara Reed, a CEO of a home healthcare business servicing homebound patients in a medically underserved area and a Medicare provider. If called to testify, Reed "could have explained the relationship between the financial intermediary and the Medicare Provider" as well as "what a home bound patient is and

34

how Medicare allows certain billings for services to home bound patients." Def.'s Mot. [86], Ex. 4, Reed Aff. ¶ 5. It does not appear that counsel interviewed Ms. Reed. But they were well aware of her, her position, and potential testimony. In fact, the Freelands discussed her potential testimony at length during trial preparation for both cases. *Strickland* states that the "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

The problem with Reed's testimony was twofold. First, Reed operated a home health agency which operated under different rules than Thomas's clinic. Thus, the testimony was less relevant and subject to cross-examination. Second, Thomas took the position that she was operating in an underserviced area, yet Reed's home health agency operated in the same area, which could damage the good-faith defense—a significant part of her case. Regardless, Thomas has not shown that the failure to call Reed would have altered the outcome of the trial, in light of her proposed testimony and the other evidence.

ix.     Vonetta James

Thomas complains that the Freelands failed to interview Vonetta James. James was a medicine tech at CMPM. Prior to working at CMPM, she had healthcare related experience, but in a secretarial or administrative capacity. Although Mr. Freeland apparently spoke with her, it does not appear that an interview occurred.

James would have testified that she received training at CMPM to provide physical medicine to patients of CMPM; would have described the care she provided and the benefits received; and would have testified that on at least one occasion she was accompanied by Dr.

Bridgett Rideau for a patient assessment. But as Freeland observes, they offered testimony virtually identical to this testimony, rendering it duplicative.

James also states in her affidavit that she "identified three or four patients who were willing to testify on Dr. Thomas'[s] behalf." Def.'s Mot. [86], Ex. 7, James Aff. ¶ 5. She called Freeland and told him about these witnesses, and Freeland told her to give the list of names to Dr. Thomas and "said he would contact [her] later, but he never did." *Id.* It is unclear how James would know what Freeland did with respect to the list, but Freeland states that he interviewed the people whose names she provided. In fact, he actually called one of the witnesses—Marie Jones. In any event, the testimony of other patients who would all confirm that they received care that was not under direct supervision would be of marginal and decreasing benefit. There has been no ineffectiveness or prejudice related to James.

f.      Failure to Find or Call Other Witnesses

Thomas also contends that despite her "instructions, the Freelands failed to make any significant attempts to identify or locate prospective witnesses." Def.'s Mem. [87] at 13. "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010). "The decision whether to present a witness is considered to be essentially strategic, and 'speculations as to what [uncalled] witnesses would have testified is too uncertain.'" *Id.* at 352–53 (quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

To begin with, the Freelands offered credible record evidence that they interviewed a substantial number of witnesses, including most of the witnesses that provided affidavits, and they offer their notes from those interviews as proof. Some of those providing affidavits either failed to mention the interviews or denied that they occurred, which diminishes their credibility. The Freelands also hired an investigator who continued to look for witnesses even during trial, and they interviewed many more witnesses that were not ultimately called.

As for the witnesses that Thomas identified, there were sound strategic decisions not to call many of them, others would have been redundant and of marginal value to the issues, and the Court finds that none of them were sufficiently significant to demonstrate the type of prejudice *Strickland* requires.

g.      Failure to Call Expert Witness

Thomas faults the Freelands for failing to call an expert witness regarding her billing practices. Federal courts within the Fifth Circuit address such arguments with caution. To prevail, the defendant must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). In addition, the defendant must demonstrate prejudice by showing a "reasonable probability that but for counsel's failure to call [an] . . . expert . . . the jury would not have convicted [the defendant]." *Woodfox v. Cain*, 609 F.3d 774, 809 (5th Cir. 2010).

The argument in this case appears to have been an afterthought and is not expressly examined in Thomas's many post-trial memoranda. More significantly, Thomas never submitted record evidence providing the information cases like *Day* require. But the issue took center stage

at the evidentiary hearing, during which Thomas testified that she wanted an expert witness. Mr. Freeland was then asked about his efforts to retain an expert and testified that he spoke with at least five potential witnesses. According to him, the experts with sufficient qualifications uniformly told him that they agreed with the Government's interpretation, and one expert went so far as to describe Thomas's billing practice as criminal. These same individuals told Freeland that he would not find an expert willing to say what he wanted. The Court credits this testimony as it too agreed with the Government's interpretation. Freeland's concerns about calling an expert were buttressed by the performance of the expert Thomas's convicted co-defendants called in the *Jones* case. According to Freeland, the testimony was "disastrous," and Freeland elected—for strategic reasons—to forego an expert and develop his theory through cross-examination.

The Court could have simply rejected Thomas's argument for failure to specifically raise or support it. Instead, the Court gave Thomas another opportunity and allowed her to supplement the record—which she did on May 23, 2012—with a joint affidavit submitted by Scott R. Mertie, Kelly Miller, and Heather Greene. Def.'s Supp. [113], Ex. A ("Expert Aff."). All three experts work in the same Tennessee firm. Their joint affidavit is not sufficient.

Starting with a procedural issue, the affidavit fails to state that these proffered experts were available to testify at the first trial and would have done so. The Fifth Circuit has repeatedly "clarified that the seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.'" *Hooks v. Thaler*, 394 F. App'x 79, 83 (5th Cir. 2010) (denying habeas relief for failure to establish availability in expert

affidavit) (citing *Woodfox*, 609 F.3d at 808); *Day*, 566 F.3d at 538 (same); *Gallegos v. Quarterman*, 265 F. App'x 300, 305 (5th Cir. 2008) (same).

But even with such assurances from these witnesses, the *Strickland* standard has not been met. To begin with, there is a question whether Freeland's efforts to find an expert were constitutionally deficient. The Court finds that he did speak with at least five experts who interpreted the regulations and policies in the same way this Court interprets them. The Freelands also watched the Government effectively cross examine the co-defendants' expert in *Jones*, describing the testimony as "disastrous." These efforts were not deficient. But even assuming the performance was deficient, prejudice has not been demonstrated.

Looking at the proffered opinions, the witnesses hoped to generally say that the regulations and statutes were confusing and ambiguous. Expert Aff. ¶ 5. They explain more precisely that Section 2051 of the Carriers Manual allows general supervision for services rendered to homebound patients in underserved areas provided that the employees meet "any pertinent State requirements." *Id.* This much of the opinion is true but adds little because the fact is undisputed in the trial record.

The witnesses then go one step further in concluding that "Mississippi did not have 'any' requirements for the personnel utilized by Dr. Thomas." *Id.* Although it is not clear from the affidavit, the experts appear to take the position that Mississippi's many laws and regulations regarding the delivery of physical therapy do not in any way restrict someone from providing therapeutic services to the general public, *for pay*, unless those individuals are Physical Therapists or Physical Therapist Assistants. The experts explain:

> It is our opinion that this law and other regulations and publications we reviewed do not preclude anyone, but Physical Therapists and Physical Therapist Assistants from performing therapeutic exercises and other activities in Mississippi. Thus, employees and other agents of Dr. Thomas were not prohibited from administering certain treatments, such as therapeutic exercises, under general supervision . . . .

Expert Aff. ¶ 8. Thus, someone could simply call themselves something other than a "Physical Therapist" or "Physical Therapist Assistant" and provide services to the public without oversight.[15] It is unlikely this opinion would ever reach the jury, and if it did, it would be subject to substantial cross-examination.

In general terms, Mississippi law regulates *services* that may be provided to the public regardless of the title that is being used. As the evidence showed at trial, physical therapy is governed in this state by the Mississippi State Board of Physical Therapy which has authority to enact rules. Miss. Code Ann. § 73-23-43 (2002). The Board was granted its authority to "safeguard the public health, safety and welfare against unqualified or incompetent practitioners of physical therapy and persons acting as physical therapists assistants." *Id.* § 73-23-43(1). The powers and duties of the Board are to be "liberally construed to accomplish that objective." *Id.*

And as discussed in detail in Part III(A)(1) *supra*, the Mississippi Code and the *Regulations Governing Licensure of Physical Therapists and Physical Therapist Assistants* define the practice of physical therapy in a way that covers the types of procedures reflected in the evidence in this case, including "therapeutic exercise." Miss. Code Ann. § 73-23-33(a). The experts themselves state that the employees provided "therapeutic exercise," Expert Aff. ¶ 11, and the CPT codes Thomas used to submit the disputed claims reflect physical therapy services

---

[15]This is similar to Thomas's argument at the hearing, and if the experts meant something else by this statement, it is not explained in the affidavit.

for which a license is required under Mississippi law.  Miss. Code Ann. § 73-23-35.  And if the services were not "therapeutic exercise," then they would not have fallen under Section 2051 of the Carriers Manual, a central component of Thomas's defense.  Thus, absent a better explanation why these experts believe that no provisions cover the services provided, the Court is left with a conclusory opinion that appears to be factually and legally deficient.

After opining that the Mississippi Code and Board regulations do not apply at all, the experts then posit that the activities fall within the exception to licensing requirements found in section 73-23-37—which seems inconsistent with their first opinion.  Section 73-23-37 excepts:

> The performance by any person of simple mechanical or machine assisted acts in the physical care of a patient, not requiring the knowledge and skill of a physical therapist under the order or direction of a licensed doctor of medicine or dentistry or of a physical therapist assistant under the direct, on-site supervision of a licensed physical therapist.

That code section is addressed *supra* in Part III(A)(1), and as previously noted, the Court agrees with the interpretation of this provision offered by Shirely Givens, the licensing investigator for the Mississippi State Board of Physical Therapy.  Defendant's experts do not explain their contrary opinion, stating only, "[i]t is our opinion that the foregoing does not require the employees or agents of Dr. Thomas to be licensed to perform these services."  Expert Aff. ¶ 9. Again, this conclusory opinion leaves too much speculation to say that it would have affected the verdict if actually admitted into evidence.

In similar fashion, the experts offer an opinion regarding whether the services were reasonable and necessary—a reimbursement requirement.  They state:

> Although we have not reviewed any patient medical records at this time, based on our discussion with Dr. Thomas and her attorneys, it appears that the services provided for by employees and other agents of Central Mississippi Physical

Medicine were considered reasonable and necessary when the services were
ordered by Dr. Thomas or a nurse practitioner.

Expert Aff. ¶ 7.  Again, the level of speculation associated with this conclusory opinion makes it

impossible to say that it would create a "reasonable probability" that but for counsel's failure to

call these witnesses, the result would have been different.  *Woodfox*,  609 F.3d at 809.

Moreover, the opinion fails to account for the Government's argument that if the

procedures were reasonable and necessary, then they were of sufficient complexity to take them

out of section 73-23-37's reach.  This theory appears in the Indictment and was addressed at trial,

and sufficient evidence would allow a rational juror to reach that result.

Finally, the experts cite the 2006 OIG memorandum regarding "incident to" therapy

services, stating that it was meant to "clarify the rules because of vagueness prior to 2005."

Expert Aff. ¶ 10.  Again, there is nothing more than a threadbare opinion, and as discussed

before, the 2006 OIG memorandum addressed a different issue.  In any event, the Court allowed

evidence regarding the rules change which undermines the suggested prejudice.

In sum, the proffered opinions are in most respects conclusory and leave too much to

speculation.  They appear to be legally and factually inaccurate, and it is highly questionable

whether they would have reached the jury under Rules 403 and 702.  If they did, then the Court

cannot find—based on the other evidence that was presented—that they were sufficient to satisfy

the prejudice prong.

IV.     Conclusion

The Court has considered all arguments, and those not expressly addressed would not change the result.  For the reasons stated, Defendant's post-trial motions [76 and 86] are denied.

**SO ORDERED AND ADJUDGED** this the 3rd day of August, 2012.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE